# PARKINSON et al. v. INDUSTRIAL COMMISSION et al.

No. 6922.  Decided August 21, 1946.  (172 P. 2d 136.)

See 71 C. J., Workmen's Compensation Acts, sec. 209; R. C. L. Perm. Supp. p. 6204. Truckman as independent contractor under Workmen's Compensation Act, notes, 42 A. L. R. 607, 43 A. L. R. 1312, 120 A. L. R. 1031. Also, notes, 134 A. L. R. 1029, 147 A. L. R. 828.

F. A. *Trottier,* of Salt Lake City, for plaintiffs.

*Grover A. Giles,* Atty. Gen., and *Andrew John Brennan,* Asst. Atty. Gen., for defendants.

WOLFE, Justice.

Certiorari to review an order of the Industrial Commission of Utah in which the defendant Molyneaux was awarded compensation and medical expenses for injuries received while hauling coke for plaintiff Parkinson, receiver for Woolsulate, Inc.

The only question to be determined is whether Molyneaux was an employee of Parkinson within the meaning of the Workmen's Compensation Act. Utah Code 1943, 42-1-1 et seq.

As stated by this court in *Luker Sand & Gravel Co.* v. *Industrial Commission,* 82 Utah 188, 23 P. 2d 225, 229: ■

"Whether or not one engaged in a service for another is an employee or an independent contractor, within the meaning of the Industrial Act, is a jurisdictional question, presenting a situation which requires this court to determine the status from the facts submitted from a preponderance of the evidence  *  *  *."

Hence the determination of the question of whether Molyneaux was an employee within the meaning of the Workmen's Compensation Act will determine whether the Industrial Commission had jurisdiction of the case.

There was no conflict in the evidence on these points which are determinative of the relationship between Parkinson and Molyneaux. Only the legal effect of the facts is in issue. On July 16, 1945, Molyneaux commenced hauling coke to the plant of Woolsulate, Inc., under arrangements made a short time prior to that date with Parkinson, the receiver of the

company, and a Mr. Carlquist, the secretary and sales manager of the company. The arrangement was that Molyneaux was to furnish his own truck and the gasoline and oil to operate it. He was to keep the truck in repair at his own expense. He was to receive from Woolsulate $2.50 per ton for coke hauled from the Columbia Steel Plant to the Woolsulate plant and $4 per ton for coke hauled from Sunnyside to the Woolsulate yards. (The record is not clear as to whether Molyneaux was to be paid weekly or bi-weekly or whether or not his pay was to be withheld for a week. We think the time of payment immaterial in this case.)

With respect to the amount of coke to be hauled, Parkinson told Molyneaux that Woolsulate needed about 35 tons a week; but that he could haul all he wanted to, as far as Woolsulate had room to store it. Molyneaux agreed that he would keep the company supplied with the amount they needed.

The hauling agreement did not require Molyneaux to haul for Woolsulate exclusively. He was not required by Woolsulate to haul on any particular day or at any particular time. His obligations to Woolsulate were limited to hauling a minimum of 35 tons of coke per week and unloading it where directed. Woolsulate did not reserve the right to tell him how much to haul on each truck load nor how to drive nor what route to take. (Apparently there was only one direct route to each coke supplier.)

The company which sold the coke at Sunnyside would load it only at 6:00 a. m. on Tuesday and Thursday of each week. Unless the trucker was there at that time and on those days he could not obtain any coke. Similarly, the Columbia Steel Company would load coke onto trucks every day only at 8:00 a. m. and during the noon hour.

On the same day that Molyneaux made his arrangements with Carlquist and Parkinson, Carlquist introduced him to Mr. Jackson, the foreman at the Woolsulate plant, and Jackson showed him where the coke was to be unloaded. The company had a bin near the furnace where Molyneaux was told to put the coke if the bin had room for it. He was also

told that if the bin was full he should dump his load on the stock pile which they designated.

Molyneaux purchased his truck in 1942. From that time until the date of his injury he made his living by hauling coal and coke for different parties except when his truck was out of order, at which times he worked as a carpenter for a construction company. He was in the business of a private carrier by truck.

Definitions of "employee" and of "independent contractor" given in the Workmen's Compensation Act are as follows:

"Where any employer procures any work to be done wholly or in part for him by a *contractor over whose work he retains supervision or control, and such work is a part or process in the trade or business of the employer*, such contractor, and all persons employed by him * * * shall be deemed, within the meaning of this section, employees of such original employer. * * * The term 'independent contractor,' as herein used, is defined to be any person, * * * engaged in the performance of any work for another, who, while so engaged, is *independent of the employer in all that pertains to the execution of the work, is not subject to the rule or control of the employer, is engaged only in the performance of a definite job or piece of work, and is subordinate to the employer only in effecting a result in accordance with the employer's design*." (Italics added) Section 42-1-40, U. C. A. 1943.

From these definitions it is apparent that whether a workman is an "employee" or an "independent contractor" is dependent on (1) whether the employer has the right to control his execution of the work, (2) whether the work done or to be done is a part or process in the trade or business of the employer, and (3) whether the work done or to be done is a definite job or piece of work. (The word "employer" as used in this opinion refers to the person who is having work done, whether the person doing the work is an "employee" or an "independent contractor.")

The most important of the determinatives of the relationship between workman and employer is that of control. The existence of a potential right to control is sufficient to create

the relationship even though that right is in fact never exercised. *Luker Sand & Gravel Co.* v. *Industrial Commission,* supra; *Utah Fire Clay Co.* v. *Industrial Comm.,* 86 Utah 1, 40 P. 2d 183; Annotation 120 A. L. R. 1031. To determine whether the right to control exists, all facts and circumstances of the relationship must be examined. The contract between the parties ordinarily does not expressly mention the right of control. And even though it expressly abjures control by the employer, yet the employer-employee relationship may exist if in fact the right of control exists.

The nature of the skill possessed by or the business engaged in by the workman is of vital consideration in determining whether the employer has the right to control the execution of his work. To borrow from the language of the writer in an article entitled "Employer-Employee Relationships" published in the Columbia Law Review (Vol. 41, page 1015, June 1941) :

> "The element which distinguished independent contractorship from master-servant relationship was the absence of the right of control over the performance. The reason why in certain situations the 'employer' did not have such right of control was that in those situations the other party to the contract was *engaged in an independent calling while he was accomplishing the result for which the other had employed him.*
>
> "Suppose the employer assigns some of the necessary functions of his business to an expert or some one licensed to do them. The performance of those duties becomes the contractor's business—the accomplishment of a definite result, be it the construction of a building, the creation of a chattel, or the furnishing of music for a dance by an orchestra. The employer is satisfied when the accomplished result is presented according to the contract." (Pages 1023, 1024)

In the case at bar Molyneaux was engaged in the independent calling of a trucker. For over two years prior to his working for Parkinson he had engaged in the business of trucking for various individuals. As a trucker he contracted with Parkinson to haul sufficient coke to keep the company supplied at all times. It was understood that to keep the company supplied Molyneaux would have to haul a

minimum of 35 tons of coke per week. He could haul such additional amounts as he desired, limited only by Woolsulate's coke storage capacity.

Woolsulate was in the business of manufacturing insulation. The record does not show that it was in the transportation or trucking business. It required coke for its business just as it required raw materials for its products. Some of the coke was delivered to it by railroad and some by truck. The company was primarily interested in obtaining the coke on time and having it deposited at convenient places. How or when the coke was hauled, whether by large truck or small, by day or night, by direct or circuitous route, etc., was immaterial to it so long as it always had readily available sufficient coke to operate its plant.

Molyneaux was paid a set price per ton for the coke hauled. He received no other compensation from the company. He was entirely free to drive as he wished, to take any route he chose, work the days he desired, work for third persons if he were so inclined. Woolsulate reserved the right to direct where the coke should be unloaded and from which of two sources of supply it should be obtained. Apparently the company had the right to discharge Molyneaux at any time without contractual liability except for the payment for coke actually hauled.

We are of the opinion from all the facts and circumstances of this case that the company did not have the control of Molyneaux contemplated by the statute to make the relationship that of employer-employee. The facts that the company could determine the place where the work ■ was to be done and had the right to discharge Molyneaux at any time without contractual liability are not controlling. Anyone employing an independent contractor, such as a plumber or a building contractor, has the right to determine where he wants the work to be done. It is when the employer can not only determine where the work shall be done but how it should be executed that the relationship is that of employer-employee. The mere right to discharge without contractual liability is not sufficient control to make

an employer-employee relationship though it is a factor to be considered with all the other pertinent facts and circumstances in determining that relationship.

Molyneaux emphasizes the fact that the coke could be obtained only at certain hours and on certain days and argues that that fact shows the employer's control. The record does not reveal that the hours and days for delivery of the coke were set directly or indirectly by Woolsulate. Rather, the inference is that the times of delivery were controlled by the coke suppliers themselves. The fact that Molyneaux had to be at the suppliers at certain times and on certain days in order to get the coke does not show him to be an employee any more than it shows him to be an independent contractor.

Besides control, the other factors determinative of the relationship between employer and workman are whether the work done was a part or process in the business of the employer and whether the workman is doing a definite job or piece of work. Both these factors are, in a general sense, included in the *control* aspect of the relationship. If the work to be done is a part or process of the employer's business, it is more probable that the employer would closely supervise that part or process and therefore more probable that he has the right to control how the workman does his job. Likewise, the probability of the employer directing the workman's activities are much greater when there is no definite job or piece of work contracted for than when he agrees to do a specific job and especially when such specific job is the type of work he does in his independent calling.

As we have already seen in this case, while the obtaining of the coke was a necessary condition for the carrying on of the company's business, the company was apparently not in the trucking business nor in the business of selling coke. The hauling of the coke was not "a part or process in the trade or business of the employer" within the meaning of the statute.

The test of a "definite job or piece of work" must be taken largely with the fact that such work is of the type that the

workman did as part of his independent calling, i. e., his "own business." Certainly many employees do a definite job or piece of work. In fact any employee does that at a particular time. The definite job meant is something not usually done by the employer as part of his business but something he usually gets some outside party to do. The "definite job" test is really not helpful unless it is taken in connection with other factors or limited to jobs such as are usually done by outside parties in pursuance of their independent callings such as construction of buildings or some job not in the line of the employer's business but something which he finds necessary or desirable in the furtherance of his business.

The evidence shows that Molyneaux contracted to do a definite piece of work although indefinite as to its duration and that such work was of the type he held himself out to do in his calling as a trucker. He was to haul 35 tons of coke per week and he could, at his own discretion, haul such additional amounts as he wished so long as the company had storage space. There is no evidence that he was to haul anything but coke for the company or to do any other work for the company except to haul the coke and to perform such other acts as were necessarily incidental to that activity.

The facts of this case are similar to those in the recent case of *Kinder* v. *Industrial Commission,* 106 Utah 448, 150 P. 2d 109. The important difference between the fact situation here and that in the Kinder case is that the truck driver in the Kinder case could haul as much or as little gravel as he liked but in this case Molyneaux had to haul at least 35 tons of coke per week. The Industrial Commission, because of that factual difference, granted compensation in this case though compensation was denied in the Kinder case.

We do not think that the factual difference between the two cases justifies different results. The fact that Molyneaux was to haul a minimum tonnage per week does not show he was under the control and therefore the employee of Woolsulate. Had a railroad or a large trucking company contracted to haul a minimum tonnage per week, neither the

railroad or the trucking company would be seriously considered to be the employee of the Woolsulate Company. The minimum tonnage agreement rather than evidencing an employer-employee relationship is indicative of the fact that Molyneaux was an independent contractor because it clearly shows that he contracted to do a definite job, which is one element of the independent contractor relationship.

In this case, Molyneaux, who had an *independent calling,* contracted to do a piece of work of the type usually done by one having the same independent calling. He contracted to do the work according to his own methods and without being subject to the control of his employer except as to the result of his work.

It follows that the relationship between Parkinson, as receiver of Woolusulate, Inc., and Molyneaux was not that of employer-employee. Molyneaux was an independent contractor when the injury complained of occurred. As Molyneaux was not an "employee" within the meaning of the Workmen's Compensation Act, the Industrial Commission exceeded its jurisdiction by awarding him compensation and medical costs.

The order of the Industrial Commission directing the plaintiffs to pay compensation to Molyneaux and to pay medical and hospital expenses arising from his injuries is annulled.

McDONOUGH, PRATT, and WADE, JJ., concur.

LARSON, C. J., dissents.